# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **3:17-CR-00239-N-1** |
| **Plaintiff,** | § | **(DCG) (RHT)** |
| | § | |
| **v.** | § | |
| | § | |
| **JUSTIN MARK SHAFER,** | § | |
| | § | |
| **Defendant.** | § | |

## MOTION APPEALING THE MAGISTRATE JUDGE'S ORDER REVOKING PRETRIAL RELEASE

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

LEGAL STANDARD.......................................................................................................... 12

ARGUMENT ...................................................................................................................... 13

   I.   The Release Conditions Violated the U.S. Constitution.................................................... 14

   II.   Mr. Shafer's Pre-Trial Detention Violates 18 U.S.C. § 3142........................................ 17

   III.   Release Is Appropriate Under the Statutory Factors ...................................................... 18

CONCLUSION.................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*CBS Inc. v. Young,*
  522 F.2d 234 (6th Cir. 1975) ................................................. 14

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010) ........................................................ 15, 16

*Cox Broadcasting Corp. v. Cohn,*
  420 U.S. 469 (1975) ............................................................. 14

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.,*
  551 U.S. 449 (2007) ............................................................. 16

*Gentile v. State Bar of Nevada,*
  501 U.S. 1030 (1991) ........................................................... 15

*In re Goode,*
  821 F.3d 553 (5th Cir. 2016) .............................................. 14, 16

*U.S. v. Arias,*
  119 F.3d 2 (5th Cir. 1997) ................................................... 13

*U.S. v. Brown,*
  218 F.3d 415 (5th Cir. 2000) .............................................. 15, 16

*U.S. v. Carmichael,*
  326 F. Supp. 2d 1267 (M.D. Ala.) ....................................... 15

*U.S. v. Cassidy,*
  814 F. Supp. 2d 574 (D. Md. 2011) ....................................... 2

*U.S. v. Foox,*
  No. 3:16-CR-516-D, 2017 WL 386650 (N.D. Tex. Jan. 27, 2017) ........................................ 13

*U.S. v. Ford,*
  830 F.2d 596 (6th Cir. 1987) ............................................... 14

*U.S. v. Montalvo-Murillo,*
  495 U.S. 711 (1990) ............................................................. 17

*U.S. v. Nwagbara,*
  No. 3:11-CR-0298-L, 2011 WL 6372342 (N.D. Tex. Dec. 19, 2011) ..................................... 13

*U.S. v. Rueben*,
   974 F.2d 580 (5th Cir.1992) ............................................................. 13

*U.S. v. Salerno*,
   481 U.S. 739 (1987)......................................................................... 12

**Statutes**
18 U.S.C. § 2261 ............................................................................... 10

18 U.S.C. § 3141 ............................................................................... 13

18 U.S.C. § 3142 ..................................................................... 12, 17, 18

18 U.S.C. § 3145 ............................................................................... 12

**Other Authorities**
HIPAA Journal "What are the Penalties for HIPAA Violations" (June 24, 2015)........................ 4

Joseph Cox, "FBI Investigating Security Researcher for Links to Dark Overlord Hacking Gang,"
   Motherboard, Apr. 4, 2017 ............................................................... 8

Joseph Cox, "Shafer Complaint" DocumentCloud posting ........................................ 10

Merriam-Webster, "Social Media" ............................................................. 17

Mike Masnick, "DOJ Subpoenas Twitter About Popehat, Dissent Doe And Others Over A
   Smiley Emoji Tweet," Techdirt, Oct. 24, 2017 ...................................... 8

Mike Masnick, "The DOJ's Bizarre Subpoena Over An Emoji Highlights Its Ridiculous
   Vendetta Against A Security Researcher," Techdirt, Oct. 25, 2017......................... 8

Techtarget.com, "Definition: social media," Sept. 2016 ............................................ 17

**Constitutional Provisions**
U.S. Const. Amend. I ............................................................... 2, 14, 16

U.S. Const. Amend. V ............................................................ 2, 14, 13, 18

U.S. Const. Amend. VI ........................................................... 2, 14, 13, 18

## INTRODUCTION

The government accuses Justin Mark Shafer of putting an FBI agent and his wife in substantial emotional distress and publishing restricted information about that FBI agent with the intent to incite violence against him. But nowhere in the record, or in the discovery in this case, is there any true threat of violence against anyone. There is no explicit language articulating any kind of threat. The "restricted" information in question was a prior home address for the FBI agent, publicly available on the internet. This entire case is built on innuendo and speculation that withstands neither constitutional nor statutory scrutiny. It is a chilling example of federal law enforcement overreach, and has serious ramifications for constitutional free speech and due process in relation to the internet and computer law. If the government's accusations in this case are a crime, then millions of social media using Americans are subject to the prosecutorial whim of the Department of Justice.

The factual bases of the government's bare bones indictment are a handful of public tweets; a Facebook friend request and message sent to a public Facebook account; the following of a public Twitter account;[1] and two emails to an FBI Agent – one with a "☺" emoji and another inquiring about the status of a report of a patient privacy violation. The Defendant made no attempt to mask his identity, and the FBI never contacted the Defendant to express any concern or to ask him to stop his communications. Instead they arrested him. And any claim that he engaged in a sustained course of conduct with a continuity of purpose to cyberstalk or threaten are ludicrous when compared to facts embodied in the case law regarding these statutes.

---

[1] Here, "following" refers to a Twitter subscribing feature which makes the public tweets made by the followed account appear in one's timeline page. It is somewhat akin to signing up for a mailing list, if mailings were limited to short missives and all mailings, from every followed account, showed up on a unified page.

1

These accusations led to a pretrial release order so broad it functioned as a prior restraint on Mr. Shafer's constitutional right to speak about the accusations made against him. When he sought to do so – through a post on his work-related blog – the magistrate judge revoked release, broadly interpreting the release condition terms and finding a violation of those conditions.

An innocent man—who the government has not charged, and cannot charge, with any violent crime, nor with any history of violent crime— is now in jail on the basis of protected speech.

Thus, Defendant Justin Shafer, through his undersigned counsel, appeals his pretrial detention order (the "Order"). The Order violates his political free speech rights under the First Amendment, his Fifth Amendment Due Process rights, and his Sixth Amendment right to put on an effective defense. Furthermore, his pretrial detention is inconsistent with the letter and intent of the Bail Reform Act of 1984, 18 U.S.C. §§ 3141, *et seq*.

This Court should release Mr. Shafer pending resolution of this matter either on the defense's forthcoming Motion to Dismiss or after a trial by a jury of his peers.

## BACKGROUND

1.      On April 19, 2017, Mr. Shafer was indicted by a Grand Jury on two felony counts in a threadbare indictment.[2] The first count alleges a violation of the federal "cyberstalking" law, 18 U.S.C. § 2261(A).[3] The second count alleges a violation of 18 U.S.C. § 119, charging Mr. Shafer

---

[2] Defense counsel alleges the following facts upon information and belief based upon the defense's review of the record and publicly available information. The Indictment in this matter is bare bones and contains almost no facts. What follows is based largely on the Criminal Complaint filed by the government in this matter and the discovery provided by the government to date. (Dkt. 1.)

[3] At least one Federal District Court has struck down an 18 U.S.C. § 2261(A) cyberstalking charge based on First Amendment grounds, in a case with facts far worse than those here. *See U.S. v. Cassidy*, 814 F. Supp. 2d 574, 584 (D. Md. 2011).

with making restricted information about a law enforcement officer public with the intent to threaten the officer or incite a crime of violence against the officer.

2.      Based on the record and discovery provided by the government so far, Count One is based on a few tweets from Mr. Shafer's public Twitter account, as well as a Facebook friend request and Facebook message sent to the FBI Agent's wife's public Facebook account requesting that she ask her husband to return Mr. Shafer's family photos and videos seized by the agent. No threats are made in these communications. There is no threatening course of conduct. Count Two appears to be based on the allegation that Mr. Shafer publicly re-posted the FBI Agent's prior home address on Twitter, after discovering it already publicly posted on the internet.

3.      Mr. Shafer is a dental computer integrator. He integrates computers and computer systems at dental offices. He is also a computer security researcher whose primary focus is on dental software and patient privacy. An established professional in this field, he has several confirmed vulnerability disclosures to his name.[4] His work has helped protect the privacy of hundreds of thousands of individuals in the U.S. and elsewhere, whose patient data would otherwise be vulnerable to public exposure.

4.      Since February 2016, armed FBI agents have intruded upon Mr. Shafer's family home three times. No weapons were ever found during any of the raids, and Mr. Shafer reacted

---

[4] A confirmed vulnerability disclosure is an industry-recognized part of the software security lifecycle. It is a published disclosure of a security problem in a software, website, or application, made publicly or privately, often through an industry-recognized disclosure program. Mr. Shafer has several confirmed disclosures with CERT, a well established disclosure program. *See generally*, CERT, Vulnerability Disclosure Policy, at http://www.cert.org/vulnerability-analysis/vul-disclosure.cfm

peacefully every time to the intrusion of his family home by federal government agents investigating non-violent alleged computer crimes.

5.      Prior to the first FBI raid of Mr. Shafer's home, Mr. Shafer was investigating the public exposure of private patient data on the open internet by a publicly traded dental technology company named Patterson Dental.[5] Around February 6, 2016, Mr. Shafer discovered that Patterson Dental had carelessly exposed patient medical data on a public, unsecured FTP server.[6] This unsecured, sensitive and private medical information was available for anyone with internet access to download and exploit. Entities such as Patterson Dental can face substantial criminal and civil penalties for willful and negligent exposure of private patient data. *See, e.g.*, HIPAA Journal "What are the Penalties for HIPAA Violations" (June 24, 2015), available at http://www.hipaajournal.com/what-are-the-penalties-for-hipaa-violations-7096/ (last visited July 10, 2017). This creates an incentive for companies to lay the blame for patient privacy violations elsewhere.

6.      Mr. Shafer, acting responsibly and through a third party he worked with to expose privacy violations, reported the results of his research to Patterson Dental. *See* "Moving onto Eaglesoft aka Patterson Dental," Justin Shafer Dental Blog, Feb. 17, 2016, at http://justinshafer.blogspot.com/2016/02/moving-onto-eaglesoft-aka-patterson.html (attached as Ex. B, Feb. 2016 Blog Post.)

---

[5] Patterson Dental is a subsidiary of Patterson Companies Inc. (referred to as "PCI" in the Complaint). *See* "Patterson Dental" available at http://www.pattersoncompanies.com/dental (last visited on July 10, 2017). It is publicly traded on NASDQ under the symbol PDCO.

[6] "FTP" stands for "File Transfer Protocol." It is a method for sending and receiving files over an internet connection, and has been used since the early 1970s. It can be set up in various ways, and can be set up with or without protections to secure the files themselves, the transfer of those files, and the listing of those files on the server computer. *See* WhoIsHostingThis.com, "A Short History of FTP with Resources," at http://www.whoishostingthis.com/resources/ftp/ (last accessed July 3, 2017).

7.     Shortly after learning of the fact that they had publicly exposed private medical data on the open internet, Patterson Dental shut down their FTP server.

8.     On February 19, 2016, after Mr. Shafer's responsible disclosure of Patterson Dental's negligent and potentially criminal treatment of its private patient data, the FBI opened a criminal investigation for violations of the Computer Fraud and Abuse Act ("CFAA") against Mr. Shafer. To date, the government has not filed any CFAA charges, or other charges, related to that investigation. (*See* Criminal Complaint at ¶ 8 (Dkt. 1) ("Complaint").)

9.     To the defense's knowledge, Patterson Dental has not been investigated for its potential criminal disclosure of private patient information on the internet. Indeed, as far as the defense can tell, Patterson Dental's request to the Department of Justice likely precipitated the repeated armed raids of Mr. Shafer's family home.

10.    The first two armed raids related to Mr. Shafer's computer security research and his discovery that Patterson Dental had exposed private patient data on the public internet. The government has yet to charge Mr. Shafer for anything related to the first two raids. This is perhaps because they know they would tread on legally dubious grounds to assert that accessing publicly available information from the public internet is criminal. They are likely also aware that a number of prominent computer crime lawyers stand ready to challenge such charges.

11.    The third raid was a result of Mr. Shafer's internet posts, messages, and emails attempting to get his seized property back. Mr. Shafer's communications, all done from internet accounts readily identifiable to him with no effort to conceal his identity in a limited time span, involved posting public information readily available on the internet, as well as interaction with the public Facebook account of SA Hopp's wife. SA Hopp was the lead FBI Agent behind the first armed raid of Mr. Shafer's family home, and participated in the second raid of Mr. Shafer's

5

home. (*See* Compl., Dkt. 1, at ¶ 11.) Upon information and belief, at no time did he provide Mr. Shafer with his contact information.

12.     On May 25th, 2016, at about 6:00 am, FBI Agents first raided Mr. Shafer's home. The FBI executed a search warrant but had no arrest warrant. His wife and children were present at the time. The FBI woke them up with violent pounding on the door and shouts of "FBI, open up!" Mr. Shafer's ten-year old daughter got to the door first, but was then collected by Mrs. Shafer for her safety. (*See* Ex. A at ¶¶ 2-4 (Decl. of J. Shafer); Compl. at ¶ 9.)

13.     When Mr. Shafer opened the door, blinding lights flooded their residence as fully armed FBI agents entered the residence and pointed weapons at Mr. Shafer, Mrs. Shafer, and their ten-year old daughter. Mrs. Shafer was prevented from going to their other two children, a five-year old and a three-year old. (*See* Ex. A at ¶ 5.)

14.     Mr. Shafer was handcuffed and taken outside in his boxers, in shock while looking at the dozens of FBI Agents and others raiding his family's residence. (*See id*. at ¶ 6.)

15.     Eventually, the FBI agents allowed Mrs. Shafer, under armed escort, to gather the other children. The FBI escort aimed their weapon at each child—a five-year-old and a three-year-old—in turn as they were collected by Mrs. Shafer. Mrs. Shafer and all three children were then placed barefoot, in their underwear, in the back of an FBI vehicle. (*See id*. at ¶ 7.)

16.     During the search, several of the family's computers, tablet devices, and cellular phones were seized. Mr. Shafer's car was damaged by the FBI in the raid. (*See id*. at ¶ 8.)

17.     On the same day, Mr. Shafer used his Twitter account—an account readily identifiable as his— to publicly complain about the FBI raids, tagging the public government twitter feeds @fbi and @fbidallas. He also allegedly posted public comments about "Special Agent Nathan Hawk."

6

(*See* Compl. at ¶¶ 9, 16.) This was a reference to SA Hopp, whom Mr. Shafer had heard identify himself as "Special Agent Hawk."

18.     On June 29, 2016, the Atlanta FBI opened an investigation of a computer hacker named the "TheDarkOverlord." The FBI seems to allege in the Complaint that Mr. Shafer was involved in a conspiracy with TheDarkOverlord, something Mr. Shafer vehemently denies and has never been charged with. TheDarkOverlord allegedly engaged in the sale of private medical records on over the internet as well as extortion. (Compl. at ¶¶ 10, 11.)

19.     On January 29, 2017, FBI agents from multiple offices raided the Shafers' family for a second time. During this raid, Mrs. Shafer asked about the return of several devices that were not Mr. Shafer's, that the family needed to conduct personal business, prepare taxes using data stored on those devices, and which contained family photos and videos. (*See* Ex. A at ¶ 10.)

20.     The government based its search warrant for the January 29, 2017 second armed raid on Mr. Shafer's family home on unspecified "IP Addresses, emails, social media accounts" links between Mr. Shafer and TheDarkOverlord. Again, the government did not execute an arrest warrant. (*See* Compl. at ¶ 11.) The charges in the Indictment in this case are unrelated to any alleged activity between Mr. Shafer and TheDarkOverlord.

21.     Mr. Shafer did report two of the DarkOverLord's hacks to the FBI, as well as to the UK's National Health Service (NHS).[7] The Complaint omits this detail.[8]

22.     Mr. Shafer, upset at the seizure of his and his family's property, including computers containing family photos and videos, used public internet searches and databases in an attempt to ascertain the contact information of "Special Agent Hawk" to request the return of his property. Eventually, Mr. Shafer discovered that SA Hopp was the agent he had heard identifying himself as "Special Agent Hawk." He discovered this by coming across a news report containing an affidavit SA Hopp signed for a criminal complaint in an unrelated matter that garnered national publicity.[9]

23.     On March 21, 2017, Mr. Shafer spoke publicly regarding the FBI raids on his family home directed at SA Hopp, SA Hopp's family, as well as publicly on the internet. At all times his identity was readily ascertainable and at no time did he make any effort to mask it. Mr. Shafer's protected speech never included any threats of physical or emotional harm to anyone. At no time prior to Mr. Shafer's arrest did anyone from the FBI or the United States Attorney's Office contact Mr. Shafer to ask him to stop his public speech and communications.

---

[7] *See, e.g.,* Joseph Cox, "FBI Investigating Security Researcher for Links to Dark Overlord Hacking Gang," Motherboard, Apr. 4, 2017, at https://motherboard.vice.com/en_us/article/538e8q/fbi-investigating-security-researcher-for-links-to-dark-overlord-hacking-gang ("'So.. The Dark Lord sent me the Farmington MO database,' Shafer told Motherboard in a Twitter message last year. Shafer also said he sent a copy of the data to the FBI."); *see also,* Mike Masnick, "The DOJ's Bizarre Subpoena Over An Emoji Highlights Its Ridiculous Vendetta Against A Security Researcher," Techdirt, Oct. 25, 2017, at https://www.techdirt.com/articles/20171025/11290738482/dojs-bizarre-subpoena-over-emoji-highlights-ridiculous-vendetta-against-security-researcher.shtml ("On July 1, 2016, Shafer emailed the Dallas FBI a copy of a database TheDarkOverlord had given him via Twitter. … When Shafer learned that TheDarkOverlord hacked the NHS, he tried to notify the NHS and cc:d the Dallas FBI.")

[8] *See id.* ("On March 31, 2017, the FBI claimed they found [a copy of the hacked database] during a raid of [Mr. Shafer's] home in January and never mentioned that he had provided it to them voluntarily in July, 2016.")

[9] *See* Mike Masnick, "DOJ Subpoenas Twitter About Popehat, Dissent Doe And Others Over A Smiley Emoji Tweet," Techdirt, Oct. 24, 2017 at https://www.techdirt.com/articles/20171023/18275838465/doj-subpoenas-twitter-about-popehat-dissent-doe-others-over-smiley-emoji-tweet.shtml (Explaining that SA Hopp's name appeared on another case's criminal complaint.)

24.     Mr. Shafer's Twitter account is still online, and the Court can examine his tweets at https://twitter.com/JShafer817. Out of 5001 of Mr. Shafer's Tweets, none of which contain any explicit threat of violence, the government is claiming that seven public tweets made over roughly three hours on March 21, 2017, combined with a few emails and social media interactions constitute a course of conduct with a continuity of purpose that put SA Hopp and his family in reasonable fear of loss of life and limb or caused substantial emotional distress. Yet no one from the FBI or any other law enforcement agency contacted Mr. Shafer regarding his tweets or communications to respond to his questions, to express any type of concern, or to instruct him to stop.

25.     On March 31, 2017, a Friday evening, armed FBI Agents appeared without warning at the Shafers' family home for a third time. Mr. Shafer was not present, but Mrs. Shafer and the children were. They were taken to the back yard, and Mrs. Shafer was ordered to call Mr. Shafer to tell him to return home. The FBI agents then seized Mrs. Shafer's phone. They also seized additional computers.

26.     The FBI contacted Mr. Ekeland, one of the lawyers representing Mr. Shafer, while he was working on an unrelated matter, and asked him to contact Mr. Shafer and ask him to turn himself in. By coincidence, Mr. Ekeland knew the FBI Agent who called from another federal case in Texas. Mr. Ekeland contacted Mr. Shafer, and arranged for Mr. Shafer to turn himself in. Mr. Shafer did so.[10]

27.     At no point during any of these raids were any weapons found at the Shafers' home.

---

[10] Had the FBI contacted Mr. Ekeland beforehand, they could have obtained the same result without the trouble of an unannounced intrusion of Mr. Shafer's family home only to find he was not home.

28.     Because he was arrested on a Friday evening, Mr. Shafer's initial appearance under

Federal Rule of Criminal Procedure 5 in front of a Magistrate Judge did not occur until the

following week. Upon information and belief, the arresting FBI Agents were aware that Mr.

Shafer was likely to spend the week end in jail before appearing before a Magistrate Judge.

29.     The children now suffer currently from trauma and substantial emotional distress as a

result of the repeated armed FBI raids. The Shafers' three-year old is now unable to sleep alone

in her room. Their (now) six-year old is struggling and withdrawn in school, where he previously

excelled. Their ten-year old is now afraid to be near open shades, for fear of being surveilled.

(*See* Ex. A at ¶¶ 14-17.) Their father has not come home since April 18, 2017, because he is in

jail awaiting trial.

30.     On March 31, 2017, FBI Special Agent Ronnie O. Buentello swore out a Criminal

Complaint against Mr. Shafer alleging violations of 18 U.S.C. § 2261(A)(2)(B) and 18 U.S.C. §

2261(b)(5).  (*See* Compl., Dkt. 1.)[11]

31.     The Complaint alleged that between May 2016 through and including March 21, 2017 in

. . . the Northern District of Texas . . . [Mr.] Justin Shafer, knowingly and with the intent to

harass and intimidate and to place under surveillance with intent to harass and intimidate a

person … did knowingly and intentionally use an interactive computer service and an electronic

communication service to engage in a course of conduct that caused, attempted to cause, and

would be reasonably expected to cause substantial emotional distress to that person; in that [Mr.]

Shafer used his Twitter account to post derogatory and inflammatory statements about [an FBI

---

[11] Initially filed on a public docket, the complaint has since been sealed, despite the fact that the public filing is readily available on the internet. *See, e.g.* Joseph Cox, DocumentCloud posting, at https://www.documentcloud.org/documents/3535241-Shafer-Complaint.html. It is unclear why the document was sealed. The defense objects to anything being sealed in the case on First and Sixth Amendment grounds, and anticipates filing a separate motion, if necessary, to request the documents in this case be unsealed.

agent] and personal identifying information of [the FBI agent] and his immediate family and his

wife online. (*See* Compl. at 2.)

32.     The conduct that Mr. Buentello swore in his affidavit in support of the Complaint that

Mr. Shafer's conduct only involved the publication of publicly available information. (*See e.g.*

Compl. at 8.) Mr. Shafer made no attempt to mask his identity and at no point articulated any

threat to commit harm to anyone. Rather, Mr. Shafer expressed his desire for his family photos

back.

33.     At the initial bail hearing on April 6, 2017, Magistrate Judge Toliver imposed broad

computer use restrictions, of the type "normally … impose[d] in a case involving someone who

exploits children using computers." (*See* Tr. 48:16-18 (Apr. 6, 2017).) These use restrictions

prohibit, among other things, "maintain[ing] or creat[ing] any account on any social media

networking site, such as Facebook, Twitter, Instagram, et cetera." (*See id.* at 49:16-18.) As

written, the conditions of release ("Conditions," Dkt. 11) include extremely broad restrictions on

computer use, on use or access to "social networking sites," and on use of one-to-one chat

software of any type. (*See* Conditions at pp. 4-5). The Conditions also include a no-contact order

prohibiting Mr. Shafer from directly or indirectly contacting SA Hopp.

34.     During the period of Mr. Shafer's pretrial release, he committed no crimes. He used no

illegal or prohibited substances. He neither fled nor attempted to flee. He did nothing that posed

a threat to the safety of any person or the community. He simply wrote a blog post comprised of

constitutionally protected speech criticizing his prosecution. (*See* Ex. C, April 14, 2017 Blog

Post) For this he has been taken away from his wife and children.

35.     Shortly after the blog post was published, Mr. Shafer received a notice of potential

violation of his pretrial conditions of release.

36.     On April 18, 2017, a revocation hearing was held before Magistrate Judge Toliver. The government referenced vague concerns regarding flight risk, and claimed that the blog post Mr. Shafer had written was evidence of danger to the community or violation of the no-contact order between Mr. Shafer and SA Hopp. The government argued at the revocation hearing that merely "criticizing" SA Hopp in the "blog site" [sic] was indirect contact. (Tr.  5:8-6:10 (Apr. 18, 2017).) At the close of the revocation hearing, Magistrate Judge Toliver revoked Mr. Shafer's pretrial release order. He has been detained since.

## LEGAL STANDARD

37.     It is a fundamental and indisputable precept of our country's criminal justice system that a defendant is innocent until proven guilty. The deprivation of a defendant's liberty before any adjudication is a serious matter implicating the bedrock constitutional principles underlying our criminal justice system and the free society the founders of this country fought and died for. Thus,"[i]n our society liberty is the norm, and detention prior to trial … is the carefully limited exception." *U.S. v. Salerno*, 481 U.S. 739, 755 (1987). Congress has carved out this carefully limited exception to the presumption of pre-trial liberty. But of course, the fundamental dictates of the United States Constitution control any statutory expression of any carefully limited exception to the presumption of liberty. *See, e.g.,* U.S. Const. Amends. V, VI.

38.     Where, as here, a Magistrate Judge has ordered pretrial detention of a defendant, a defendant may appeal the order as of right to the District Court Judge. 18 U.S.C. § 3145(b) ("a person … ordered detained by a magistrate … may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order.").

39.     The statutory basis for determining whether a defendant should have his liberty taken from him before a jury or judge has passed on his guilt is found in 18 U.S.C. § 3142.

12

40.    "An individual shall be released pending trial unless a judicial officer finds that 'no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *U.S. v. Foox*, No. 3:16-CR-516-D (15), 2017 WL 386650, at *3 (N.D. Tex. Jan. 27, 2017) (quoting 18 U.S.C. § 3142(e)(1)).

41.    "[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required," a court must consider: '(1) the nature and circumstances of the offense charged ...; (2) the weight of the evidence against the person; (3) the history and characteristics of the person ...; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.' *U.S. v. Nwagbara*, No. 3:11-CR-0298-L, 2011 WL 6372342, at *2 (N.D. Tex. Dec. 19, 2011) (quoting 18 U.S.C. § 3142(g)). "In reviewing a magistrate judge's order of pretrial release, the district court acts *de novo* and makes an independent determination of whether release is proper." *U.S. v. Arias*, 119 F.3d 2 (5th Cir. 1997) (citing 18 U.S.C. § 3145(a) (1); *U.S. v. Rueben*, 974 F.2d 580, 585 (5th Cir.1992).

## ARGUMENT

Mr. Shafer's continued pre-trial detention violates the United States Constitution as well as the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq*. The original terms of his supervised release violated his free speech rights under the First Amendment. Imprisoning him pre-trial based on his speech is unconstitutional. This current, unconstitutional incarceration before an adjudication by a jury of his peers hampers Mr. Shafer's ability to put on an effective defense, as he is not free to diligently prepare for his defense with his attorneys due to constant monitoring and harassment in jail. This violates his Fifth Amendment Due Process rights and his Sixth Amendment right to mount an effective defense. Moreover, none of Congress's narrowly prescribed exceptions to an innocent defendant's presumption of liberty apply here. Mr. Shafer

13

should be released pre-trial under appropriate conditions because his current incarceration violates the Constitution and federal law.

## I.    The Release Conditions Violated the U.S. Constitution

42.    Mr. Shafer's initial release conditions, as written and as applied, created a prior restraint on his constitutionally protected speech. A prior restraint, "defined as 'predetermined judicial prohibition [s] restraining specific expression,'" is generally only constitutionally permitted if the government can establish "'the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest.'" *In re Goode*, 821 F.3d 553, 559 (5th Cir. 2016) (quoting *Levine v. U.S. Dist. Court for Cent. Dist. of Cal.*, 764 F.2d 590, 595 (9th Cir.1985).) Prior restraints are presumed unconstitutional. *See id*. To survive legal scrutiny, they must be narrowly tailored and provide the least restrictive means of the intended restriction. *See id*. In a pretrial order in a criminal case, the balance to be struck is between an individual's free speech rights and the state's and defendant's interest in a fair trial. *See id*.

43.    Those speech rights go to a legitimate and important public concern. "It is well established that '[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions ... are without question events of legitimate concern to the public....'" *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975). A broad order curtailing a defendant's speech about their case will often fail the clear and present danger test. *See U.S. v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987) (citing *Carroll v. President and Commissioner of Princess Anne*, 393 U.S. 175, 183 (1968)); *see also, CBS Inc. v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) (collecting Supreme Court cases on prior restraints on discussing litigation).

44.    The courts have long recognized that a party's or counsel's speech may be regulated "under a less demanding standard than … for … the press." *Gentile v. State Bar of Nevada*, 501

14

U.S. 1030, 1074 (1991). The 5th Circuit has generally endorsed a "substantial likelihood" test for whether a defendant's speech may be curtailed. *See U.S. v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000) (defining the test as whether "extrajudicial commentary by [parties or their lawyers] would present a 'substantial likelihood' of prejudicing the court's ability to conduct a fair trial."). His initial conditions of release fail that test.

45.     Mr. Shafer has a First Amendment right to criticize his prosecution and rebut the accusations made against him. He did so on a personal website post that contained no threat, merely information about the case and links to news articles. (*See* Ex. B). This is well within his protected speech rights. *See U.S. v. Carmichael*, 326 F. Supp. 2d 1267, 1301 (M.D. Ala.), supplemented, 326 F. Supp. 2d 1303 (M.D. Ala. 2004) (holding a defendant's website with a mock "Wanted" poster seeking information about individuals in his case was "not a serious threat sufficient to warrant a prior restraint on … speech or an imposition on his constitutional right to investigate his case"). "Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010).

46.     Mr. Shafer's initial conditions of release, and his current incarceration, prohibit and prevent him from speaking out about his case to the audience that is most concerned with hearing about it – other internet users and security researchers. This is well within Mr. Shafer's constitutionally protected right to speak out about his case. It also comes well before any jury is seated or even considered, and is not the type of communication that could unduly sway a jury or otherwise endanger a fair trial.

47.     Where a restriction on speech only burdens the defense, a higher threshold of proof must be show to justify the restraint. *See U.S. v. Carmichael*, 326 F. Supp. 2d 1267, 1294 (M.D. Ala.),

supplemented, 326 F. Supp. 2d 1303 (M.D. Ala. 2004). As the government is free to issue a press release at the start of a case or at any other time, so must Mr. Shafer be permitted to speak about this case in public forums. *Citizens United*, 558 U.S. at 340 (2010) ("Prohibited, too, are restrictions … allowing speech by some but not others").

48.     In a world that increasingly consumes its information from and through online sources, the Conditions created a near absolute restriction on Mr. Shafer's speech and other expressive acts. There is nothing in the conditions, as written or as applied, which tailors these restrictions to the relevant interest in a fair trial.

49.     Much like the local criminal rule at issue in *In re Goode*, these conditions of release operate as a complete bar on Mr. Shafer's speech. Any order which limits or curtails this right is subject to strict scrutiny, to avoid being an unconstitutional restriction on speech. Strict scrutiny "requires the Government prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United* at 340 (quoting *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 464 (2007) (opinion of Roberts, C.J.)). The interest in a fair trial, and avoiding "trial by newspaper," is compelling. *See Brown*, 218 F.3d at 423 (5th Cir. 2000). There is no trial by newspaper here, however, and the release conditions here were not tailored, narrowly or at all. Thus, they are unconstitutional in as much as they act as a complete bar to Mr. Shafer speaking publicly about his case.

50.     Even if the relevant Conditions are found facially constitutional, its terms must be read narrowly to avoid becoming unconstitutional as applied. *See Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 452 (2007). The Conditions' terms should be read narrowly, or at least no more broadly than the common usage of its plain terms. The Conditions prohibit

"social media" use, and by the common use of that term blogs are not included.[12] It would be unjust to punish Mr. Shafer for speech he believed was permitted, and which numerous readers in a similar position to Mr. Shafer would also believe was permitted.

51.     Mr. Shafer's prolonged pretrial detention interferes with Mr. Shafer's right to preparation of a defense. Because of this prolonged detention, he cannot communicate with counsel except under monitored conditions or with onerous bureaucratic limitations. This violates his due process rights under the Fifth and Sixth Amendment. It creates a substantial barrier to preparing an effective defense. *See U.S. v. Montalvo-Murillo*, 495 U.S. 711, 724 (1990) ("freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction.") The conclusory assertion of a risk to community safety does not justify this deprivation of Mr. Shafer's freedom. *See id.* at 729 ("the magnitude of the injury inflicted by pretrial detention requires adherence to strict procedural safeguards that cannot be sacrificed in the name of community safety.")

## II.     Mr. Shafer's Pre-Trial Detention Violates 18 U.S.C. § 3142

52.     The statute that governs release conditions is clear, if recognizance or an unsecured bond are insufficient, then release should be subject to the "least restrictive" conditions the judicial officer determines will "reasonably assure" the defendant's appearance and reasonably assure "the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

53.     The Conditions imposed by Magistrate Judge Toliver set limits far beyond what is necessary in a case that does not in any way involve online child exploitation. It is also a bar that

---

[12] In its broadest sense, "social media" may refer to any electronic communication used to share information among individuals or communities. *See, e.g.* Merriam-Webster, "Social Media," at https://www.merriam-webster.com/dictionary/social%20media. However, in common usage it refers to a relatively narrow set of social applications and services. *See, e.g.*, Techtarget.com, "Definition: social media," Sept. 2016, at http://whatis.techtarget.com/definition/social-media.

does not prohibit Mr. Shafer's writing a blog post. Mr. Shafer did not lose his free speech rights simply by being accused of a crime. If that were the case, the government could chill the speech of any critic it wanted simply by charging a crime.

54.     The Government provided at most only conclusory arguments as to Mr. Shafer's potential flight risk or danger to the community. None bear weight. Likewise, the government's argument that a blog post criticizing a person is indirect contact badly misconstrues the nature of a blog post. In the same sense that "talking about" someone is distinct from "talking with" someone, a blog post mentioning a person is distinct from contact.

55.     Mr. Shafer penned a blog post. As instructed at the hearing, he did not post on social media in the sense it is understood by many people. He did not contact SA Hopp directly or indirectly. At most, he violated a single, unconstitutional condition of release, under which his online speech was curtailed well beyond the statutory limits of the Bail Reform Act of 1984.

### III.     Release Is Appropriate Under the Statutory Factors

56.     At the hearing the Government sought revocation on the specious notion that a single violation of a vaguely worded pretrial release condition rendered no set of conditions sufficient to protect the community or to secure Mr. Shafer's appearance in court.

57.     The charges against Mr. Shafer create no rebuttable presumption of detention. *See* 18 U.S.C. § 3142(e). To justify pretrial detention on the basis that Mr. Shafer is a serious flight risk or a danger to the community, the government would need to prove by a preponderance of the evidence that no condition, or combination of conditions, will reasonably assure his appearance in Court. *See* 18 U.S.C. § 3142 (e). They cannot meet this burden. Mr. Shafer has never attempted to flee this prosecution. He has merely criticized it publicly. And for that, he has been incarcerated before being found guilty.

58.     A *de novo* review of this revocation is necessary to assure an innocent man, whose only alleged criminal acts consist of benign speech far short of the conduct required by 18 U.S.C. § 2261A, is not subjected to prolonged and arbitrary pretrial detention.

## CONCLUSION

Mr. Shafer has now been in jail without being found guilty of any crime for nearly 6 months. His children have been denied their father, and his wife left to support their family on her own. All this because of a blog post that criticized the government but made no threats. Mr. Shafer is being punished for his constitutional protected political speech, and this Court should release him pending trial with appropriate supervisory conditions that do not unduly restrain his speech. Mr. Shafer requests that the Court:

a)    consider this order *de novo* and either

b)   reinstate his pretrial release under appropriate conditions or

c)   hold a hearing to determine appropriate conditions, and

d)   for such other relief this Court finds just.

DATED: November 6, 2017                    Respectfully submitted,

                                           *s/ Tor Ekeland*
                                           Tor Ekeland (NY Bar No. 4493631)
                                           *Pro Hac Vice*

                                           *s/ Frederic B. Jennings*
                                           Frederic B. Jennings (NY Bar No.5246079)
                                           *Pro Hac Vice*

                                           Tor Ekeland Law, PLLC
                                           195 Montague Street, 14th Floor
                                           Brooklyn, NY 11201
                                           tor@torekeland.com
                                           fred@torekeland.com
                                           tel:     (718) 737-7264
                                           fax:     (718) 504-5417


                                           Jay Cohen
                                           (TX Bar No. 24069528)
                                           Blass Law, PLLC
                                           917 Franklin Street, Suite 400
                                           Houston, TX 77002
                                           jay@blasslaw.com
                                           tel:     (713) 225-1900

20

**CERTIFICATE OF SERVICE**

I, Tor Ekeland, certify that on Nov. 6, 2017, I served the attached motion via ECF on the attorneys of record in the above captioned proceeding.

DATED: Nov. 6, 2017

*s/ Tor Ekeland*

Tor Ekeland (NYS Bar No. 4493631)
Tor Ekeland Law, PLLC
195 Montague Street, 14th Floor
Brooklyn, NY 11201
tor@torekeland.com
tel:    (718) 737-7264
fax:    (718) 504-5417

21